

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 07 CR 62 |
| Plaintiff, ) | |
| ) | District Judge |
| v. ) | Mark Filip |
| ) | |
| JOHN FROELICH, et al., ) | |
| ) | Magistrate Judge |
| Defendants. ) | Arlander Keys |

## MEMORANDUM OPINION AND ORDER

On February 14, 2007, the grand jury returned a thirty-four count indictment against, among other defendants, John Froelich and Paul Kocourek, alleging violations of 18 U.S.C. §§2, 371, 1341 and 1343, and 21 U.S.C. §§331 and 333. More specifically, defendant Froelich was charged with 24 counts of wire fraud, 6 counts of mail fraud, 2 counts of misbranding drugs, and 1 count of conspiracy to misbrand drugs; Kocourek was charged with 24 counts of wire fraud and 6 counts of mail fraud – all in connection with a business, owned and operated by the defendants, that claimed to provide allergy testing and treatment. After their arrests, defendants Froelich and Kocourek appeared before Magistrate Judge Ashman, the Magistrate Judge then on duty, who ordered them released on bond pending trial, and set certain conditions for their release. Judge Ashman's Orders provided, in pertinent part, that Froelich and Kocourek were to refrain from committing "any offense in violation of federal, state or local law while on release," and that they were to refrain from

"submitting claims containing false information to insurance companies and health care benefit programs"; the orders further provided that they were "prohibited from causing allergy shots to be prepared or administered without a valid prescription, that complies with state laws, written by a doctor who has examined and diagnosed the patient." See Orders Setting Conditions of Release, ¶¶1, 7(u)(v).

On June 22, 2007, the government moved to revoke Froelich's and Kocourek's bond pending trial, arguing that, since their release, the defendants have

> continued to draw blood from dozens of individuals for allergy testing, without having a doctor involved. Froelich and Kocourek also continued to submit false insurance claims to insurance providers, which claims were similar to the fraudulent claims charged in the indictment, in violation of the conditions of their bond.

Government's Motion, p. 1. In its motion, the government represented that "[d]etention is the only way to prevent Froelich and Kocourek from continuing to commit fraud." Id., p. 2.

Mr. Froelich and Mr. Kocourek filed separate responses to the motion, though both argue that, while out on bond, they committed no crime and have attempted to respect and abide by the conditions of their respective release orders; they also both argue that they are not flight risks and that they pose no threat to the community – on the contrary, they are both lifelong residents of Chicago who, before this case, had never even been

arrested for anything. They both argue that, in light of all of this, detention would be an extreme and inappropriate result. Judge Filip, the district judge assigned to the case, referred the motion to this Court, which set a briefing schedule and a July 13 hearing date.

At the hearing, the government, in support of its allegation that the defendants submitted fraudulent insurance claims containing false statements during the time they were out on bond, presented two notebooks of documentary evidence, as well as the live testimony of William Conway, a Special Agent with the FDA's Office of Criminal Investigation and the case agent assigned to the case. Agent Conway testified that he had interviewed six witnesses who had attended the Chicago Midwest Beauty Show in Rosemont, Illinois during the first week of March, 2007; he testified that each witness told him she had had her blood drawn at a booth at the show advertising "free allergy testing"; each witness told him she was told by someone in the booth that the testing would be free to her, but that the company would bill her insurance company. Transcript of Proceedings of July 13, 2007, p. 25. Each witness also testified that she had not been seen by a doctor, indeed, that no doctor appeared to be present in the booth. *Id.*, p. 25-26. Agent Conway testified that one of the witnesses, Yvette Martinez, identified John Froelich as the person who drew her blood; he said Ms. Martinez

told him that, at the time of the show, Mr. Froelich was wearing a name badge that identified him as a registered nurse with Northwestern Memorial Hospital. *Id.*, p. 26. Agent Conway testified that none of the witnesses mentioned Mr. Kocourek and none was able to identify him from a photo spread. *Id.*, pp. 28-29.

Agent Conway also testified that he had interviewed several witnesses who had attended a craft show at the Arlington Park Racetrack during the second week of March, 2007; he testified that the people he interviewed all told him they had had their blood drawn at a booth at the show advertising "free allergy testing." *Id.*, pp. 29-30. He testified that the witnesses all told him that they were told that the testing would not cost them anything, but that the company would bill their insurance companies; he testified that they told him they were not examined by a doctor. *Id.*, pp. 31-32. Agent Conway testified that one of the witnesses he interviewed identified John Froelich as the person who drew her blood; the same witness identified Paul Kocourek as the person introduced as the accountant of the company. *Id.*, pp. 32-34.

Agent Conway testified that, in addition to the witnesses who had had their blood drawn, he also interviewed Dr. Krishdeep Khosla, a doctor who signed a contract with the defendants' company, Progressive Institute of Allergy. The contract, a one-

page document introduced into evidence by the government (Government's Exhibit L), provides that, as physician for PIA, Dr. Khosla would (1) review the allergy program for medical appropriateness; (2) act as physician liaison with referring physicians from time to time; and (3) provide information required for third party billing. It appears that Mr. Froelich signed the contract on February 9, 2007, and Dr. Khosla signed the contract on February 15, 2007. See Government's Exhibit L. Agent Conway testified that he interviewed Dr. Khosla twice, and that Dr. Khosla told him that the owner of PIA approached him about being the doctor for his company, that Dr. Khosla agreed to do so and signed the contract; Agent Conway testified that Dr. Khosla told him, however, that he had done no work for the company; he had not seen, discussed or diagnosed any patients, had not approved any tests, had not authorized the company to use his name for any insurance company billing, and had not received any money from the company. *Id.*, pp. 37-39. Agent Conway also testified that Dr. Khosla told him he was not aware that any insurance claims had been submitted under his name. *Id.*, p. 40.

Agent Conway also testified regarding 11 health claim forms that Humana had received from PIA; according to Agent Conway, the forms showed that each insured was diagnosed with "allergic rhinitis," and that each insured had some blood testing done. *Id.*, pp. 50-52. Agent Conway testified that each claim form was

accompanied by a form showing the taxpayer identification number for PIA, signed by Paul Kocourek; according to Agent Conway, the insurance company needed this information to pay the claim. *Id.*, p. 53.

Agent Conway testified that he interviewed Barbara Stencil, a manager in Humana's special investigations unit, who told him that when a claim form contains a diagnosis code, Humana assumes that the diagnosis has been made by a doctor. *Id.*, pp. 53-54. According to Agent Conway, Ms. Stencil told him that if Humana received a claim form that did not include a doctor's name and a diagnosis code, Humana would not pay the claim. *Id.*, p. 55. He testified that she also told him that, without doctor involvement, without a medical history and physical being taken, Humana would not pay the claim. *Id.*, p. 56. Agent Conway testified that Ms. Stencil also told him that Humana would not pay a claim in which an insured's co-pay was waived; nor would Humana pay a claim where the services had not yet been provided or performed. *Id.*, p. 56, 58. Finally, Agent Conway testified that he had also interviewed administrative representatives from Aetna and United Healthcare, and that they had provided information that was consistent with that provided by the Humana representative. *Id.*, p. 71. Agent Conway clarified that these representatives were not saying that any of these conditions were true with respect to the claim forms submitted by PIA; they were

6

merely speaking in general terms about what their internal policies were for payment of claims. *Id.*, pp. 57-58.

On cross-examination, Agent Conway admitted that performing services without collecting a co-pay is not illegal; nor is it illegal to draw blood without having a doctor present or without taking a medical history before doing so. Transcript, pp. 113-118. He also admitted that he has no idea who affixed Dr. Khosla's name to the claim forms that were submitted for PIA, though he is aware that Kasia Pawlucka told him that Mr. Kocourek did the billing for PIA. *Id.*, p. 122. He admitted that he had no idea who, specifically, sent the claim forms to the insurance companies and had no idea who, specifically, would have filled in the information the government contends is false. With regard to the insurance companies' notion of what is "medically necessary," Agent Conway admitted that there is no external regulation or law that would define that phrase; rather, the phrase is an internal insurance company catchphrase. *Id.*, p. 125.

After hearing from Agent Conway, the Court advised the parties that it had some questions concerning the role of Dr. Khosla in these matters and that it would like to hear from Dr. Khosla directly. The Court continued the hearing and rescheduled the matter for August 1, 2007. At that time, the government presented Dr. Khosla, who testified concerning his involvement with the defendants.

7

By way of background, Dr. Khosla testified that he has been a doctor for fifteen years and has had his own private internal medicine practice for about 9 years; he testified that he also works out of four or five hospitals, including Mount Sinai Hospital and Weiss Memorial Hospital, where he also does some teaching. Transcript of Proceedings of August 1, 2007, pp. 147-148. With regard to the defendants, Dr. Khosla testified that he had two meetings involving Progressive Institute of Allergy. Initially, John Froelich and another individual came to see him at his office; they told him about Progressive Institute of Allergy, told him they had operated this allergy testing business for years, and that they needed a licensed physician to oversee their program and to provide quality assurance for the program. *Id.*, p. 148, 153-154. He testified that a woman he worked with at Mount Sinai Hospital had referred Froelich to him. *Id.*, p. 165. He testified that he met with Froelich and his partner for about 10 to 15 minutes, and, after talking with them, he signed a contract. *Id.*, p. 148, 166. He testified that it was his understanding that he would not see patients; as he understood it, he would be reviewing "the quality aspect of the patient care – quality assurance, you know, maybe review the records and provide quality assurance." *Id.*, p. 154.

With regard to the specific responsibilities included in the written contract, Dr. Khosla testified that the contract required

him to "review the allergy program for medical appropriateness," and to "provide information required for third-party billing," but that he never did these things. *Id.*, pp. 154-156. He also testified that the contract on its face required him to "act as physician liaison with referring physicians from time to time," but that he had no idea what that meant. *Id.*, p. 155. He testified that, in exchange for performing these services, he was to be paid based upon the time he committed to the program; he testified that he never received any money from the company. *Id.*, p. 156-157.

Dr. Khosla testified that the defendants never asked him if they could use his name on claim forms, and that he never gave them permission to do so. *Id.*, p. 157. He testified that no one from PIA ever asked him to draw blood, to order blood tests, to examine, discuss or diagnose patients, or to attend fairs or festivals on behalf of PIA. *Id.*, p. 159. He testified that he never authorized PIA to use his name on claim forms for patients he had not examined or for tests he did not order. *Id.*, p. 160.

Dr. Khosla testified that his second meeting involving PIA occurred in March or April 2007, when Mr. Froelich and another person came to see him to advise him that PIA was having "some problem with FDA"; Khosla testified that he told them that they should "first clear yourself with FDA, and then we'll go from there." *Id.*, pp. 157-158. Dr. Khosla testified that, other than

this meeting and the initial meeting around the same time the contract was signed, he has had no contact with anyone from PIA. *Id.*, p. 158. He testified that he signed the contract with PIA, but could not remember whether he had ever signed any other documents for PIA. *Id.*, p. 161.

On cross-examination, Dr. Khosla testified that, at their initial meeting, Froelich told him about the nature of PIA's business; he told him that they go out to health fairs and exhibitions to meet people, and that they draw blood for the purpose of determining whether the people have allergies; Dr. Khosla testified that he generally understood that any blood PIA drew would be sent to a lab for testing. *Id.*, pp. 167-169. Dr. Khosla admitted that the contract specifically provided for him to be paid based on the number of patients who received allergy shots; yet, he initially testified that he had no idea whether allergy shots would be administered to patients who might want them. *Id.*, pp. 170-172. He later admitted that he knew and understood that, to get paid under the contract, PIA would have to draw blood from a patient, send that blood to a lab for testing and have it come back with a positive allergy test, and then the person would have to agree to have shots to treat his or her allergies; he admitted that, only if all of this happened, would he actually receive any money under the contract he signed with PIA. *Id.*, 172.

Also on cross-examination, Dr. Khosla testified that, although he contended that he did not understand the contract language regarding his responsibilities, he never asked anyone at PIA - or anyone else for that matter - about it; he never sought clarification or asked for an explanation of what he was supposed to be doing. *Id.*, pp. 181-182, 185. He also testified that, despite what he knew about how PIA operated, he had no idea that the company would be submitting claims to insurance companies, and that he had no idea how PIA made its money; he testified that he never bothered to ask. *Id.*, p. 182-183. He later testified, however, that Froelich and Kocourek must have told him, at their first meeting, that the way PIA gets paid is through the insurance companies. *Id.*, p. 203. He testified that he did not know what was meant by "third-parties" with respect to billing. *Id.*, p. 202. Finally, he testified that, although the contract with PIA gave him the right to terminate, he never did so and never took any steps to sever his relationship with PIA and the defendants. *Id.*, p. 183.

After Dr. Khosla testified, the parties argued their respective positions to the Court, and the Court took the matter under advisement. For the reasons explained more fully below, the Court now denies the government's motion to revoke Mr. Froelich's and Mr. Kocourek's bonds.

## Discussion

18 U.S.C. §3148(a) provides that, when a person who has been released under §3142 violates a condition of his release, he is "subject to a revocation of release, an order of detention, and a prosecution for contempt of court." The statute instructs that the Court

> shall enter an order of revocation and detention if, after a hearing, [it]-
> (1) finds that there is-
>     (A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or
>     (B) clear and convincing evidence that the person has violated any other condition of release; and
> (2) finds that-
>     (A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>     (B) the person is unlikely to abide by any conditions or combination of conditions of release.

18 U.S.C. §3148(b).

Initially, there is no clear evidence that the defendants committed a crime while on release. When discussing the specifics of what the defendants are alleged to have done, Agent Conway admitted that he was not aware of any rule, regulation or law that had been violated. The government's argument on this point seems to equate the violation of an internal insurance company policy or assumption with the commission of a federal

12

crime. The government has alleged that sending through the mail a claim form containing a doctor's signature, when that doctor never examined the insured, amounts to fraud. But that theory must be tested at trial. Until then, the Court will not find probable cause to believe that the defendants committed any crime while out on bond; therefore, paragraph 1(A) above does not apply.

With regard to paragraph 1(B), the government argues that the defendants violated the terms of their release orders that prohibit them "from submitting claims containing false information to insurance companies and health care benefit programs."[1] At the hearing on the motion to revoke the defendants' bond, the government argued that, in connection with its activities at the Midwest Beauty Show and the craft show at Arlington Park, PIA and defendants Froelich and Kocourek submitted false claims – namely, they submitted claim forms that: (1) included Dr. Khosla's name, even though he did not see the patients; (2) included diagnosis codes, even though the patients were never seen or examined by a doctor; (3) requested coverage for services and tests that had not been performed (e.g., testing of blood for allergy issues); and (4) failed to indicate that the services were performed by an outside lab. Transcript of Proceedings of July 13, 2007, pp. 68-71.

---

[1] This prohibition appears at paragraph 7(u) in Mr. Kocourek's Order and paragraph 7(v) in Mr. Froelich's Order.

First, as explained above, even Agent Conway admitted that these specific actions did not violate any statute, rule or regulation. Rather, the government's argument focuses not on the law, but on assumptions made and policies set by insurance companies regarding how their claims are handled and paid.

Additionally, the Court is not persuaded that the government has met its burden of showing, by clear and convincing evidence, that the defendants submitted claims containing false information. With regard to the use of Dr. Khosla's signature, it is not clear whether the government is arguing that the claim is false simply because his name appears on the claim form, or whether it is arguing that the claim is false because the defendants did not have permission to use his name on the form. If the former, the claim could only be characterized as "false" when read in the context of the insurance companies' assumptions and policies – and there is no evidence that these defendants knew about those assumptions and policies. If the latter, the Court is not persuaded that the defendants did use Dr. Khosla's name without permission. Although Dr. Khosla testified that he did not authorize the defendants to put his name on the claims forms, having observed Dr. Khosla and having heard his story first hand, the Court gives little weight to that testimony; Dr. Khosla was evasive on the stand and his testimony was, simply, not believable – this is particularly true of his testimony about

what he authorized and what he agreed to do by signing the contract with PIA.

The government argues that the defendants' claims were false because they indicate that co-pays and deductibles were charged, when in fact they weren't; it also argues that the defendants' claims were false because they indicate that the insureds were seen by a doctor who determined medical necessity, when, in fact, they weren't. Again, these "false statements" are apparent only if one is aware of, and accepts, the insurance companies' internal claims handling assumptions and policies; the claims do not appear to be false on their face. Additionally, whether this conduct, if proven, amounts to a crime, has not yet been tested. That question will be resolved by a jury at trial, and any ruling predicated on the untested proposition is premature. Perhaps more importantly, even if the Court were persuaded that the government had shown, by clear and convincing evidence, that the defendants violated the terms of their release orders, it would still decline the government's invitation to revoke the bonds of Froelich and Kocourek and send them to jail pending trial. These men pose no risk of flight and no danger to the community; they have never before been in trouble with the law. Given all of this, detention pending trial would seem to be a very harsh remedy indeed.

The government argues that detention is necessary because these men have thumbed their noses at the Court by deliberately continuing with the behavior alleged in the indictment. But the Court is not persuaded that that is the case. First, to the extent the claim forms contain false information, there is nothing to suggest that these defendants knew that the information was "false" or that they knew the insurance companies would view them as "false"; indeed, the information can only be deemed to be false if it is read in the context of the internal insurance company processing assumptions and guidelines described by Agent Conway; and there is no evidence that these defendants knew about those internal guidelines and policies. The Prosecutor represented at the hearing that she had advised Mr. Kocourek about what activity was and was not illegal back in June of 2006. But she's hardly an unbiased counselor, and the Court will not penalize the defendants for, perhaps, failing to accept her word as gospel.

## Conclusion

For the reasons explained above, the Court denies the government's motion to revoke the bonds of defendants John Froelich and Paul Kocourek pending trial [#79].

Dated: September 7, 2007          ENTER:

*/s/ Arlander Keys*
ARLANDER KEYS
United States Magistrate Judge